Gustave S. Geiger, Appellant, *v.* James I. Bush et al., Respondents.

Argued April 20, 1942; decided July 29, 1942.

*I. Maurice Wormser, Samuel Rubin* and *David J. Colton* for appellant. The agreement between plaintiff and defendants was not void for indefiniteness or uncertainty but was clear and explicit in its terms. (*Cohen & Sons* v. *Lurie Woolen Co.*, 232 N. Y. 112; *Outlet Embroidery Co.* v. *Derwent Mills*, 254 N. Y. 179; *Hedeman* v. *Fairbanks, Morse & Co.*, 286 N. Y. 240; *Rubin* v. *Dairymen's League Co-Operative Assn.*, 284 N. Y. 32; *Roberge* v. *Winne*, 144 N. Y. 709; *Weintraub* v. *Kruse*, 234 N. Y. 575; *Wertheimer* v. *Boehm*, 241 N. Y. 575.)

*Frederick E. Crane, Robert L. Reed* and *Henry L. de Give* for Thomas H. McKoy, Jr., et al., respondents. The variance between the pleadings and the proof was sufficient to justify the setting aside of the verdict and the dismissal of the complaint as against the defendants McKoy and Page. (*Brocia* v. *Romeo & Co.*, 240 N. Y. 233; *Northam* v. *Dutchess Co. Mut. Ins. Co.*, 177 N. Y. 73; *Seavey* v. *Ansonia Mfg. Co.*, 111 N. Y. Supp. 661.) The failure of the plaintiff to prove due performance of the contract as pleaded was a proper ground for setting aside the verdict and for dismissing the complaint. (*Pershall* v. *Elliott*, 249 N. Y. 183; *Sternberg* v. *Curie*, 242 App. Div. 581; *Meriden Gravure Co.* v. *Bedell*, 232 App. Div. 454.) The trial court properly found that the alleged agreement to which the plaintiff testified was too vague, indefinite and uncertain to be enforced. (*Strong* v. *Sheffield*, 144 N. Y. 392; *Smith* v. *Dotterweich*, 132 App. Div. 489; *Manufacturers Trust Co.* v. *Weldon*, 267 N. Y. 488; *Lally* v. *Cronen*, 247 N. Y. 58; *Royal Bank of Canada* v. *Williams*, 220 App. Div. 603; *Garcin* v. *Granville Iron Corp.*, 137 Misc. Rep. 648; *Soma* v. *Handrulis*, 277 N. Y. 223; *Adair* v. *Brimmer*, 74 N. Y. 539; *Samuel* v. *Bastress*, 267 N. Y. 279; *Hutchinson* v. *Birdsong*, 211 App. Div. 316.)

*Edward K. Hidalgo, Oleg Peter Petroff* and *John P. Moore* for Cedric E. Fauntleroy, respondent. The variance between the contract alleged in the complaint and the contract testified to at

the trial is fatal to the complaint. (*Gallaudet* v. *Kellogg*, 16 N. Y. Supp. 79; 133 N. Y. 671; *Seavey* v. *Ansonia Mfg. Co.*, 111 N. Y. Supp. 661; *Lansing* v. *M' Killip*, 3 Caines, 286; *Sternberg* v. *Curie*, 242 App. Div. 581; *Meriden Gravure Co.* v. *Bedell*, 232 App. Div. 454.) The testimony at the trial does not establish an enforceable contract. (*Chiapparelli* v. *Baker, Kellogg & Co.*, 252 N. Y. 192; *Varney* v. *Ditmars*, 217 N. Y. 223; *Strong* v. *Sheffield*, 144 N. Y. 392; *United Press* v. *New York Press Co.*, 164 N. Y. 406; *Queensboro Farm Products, Inc.*, v. *State of New York*, 262 App. Div. 426; *Flaherty* v. *Cary*, 62 App. Div. 116; 174 N. Y. 550; *Bluemner* v. *Garvin*, 120 App. Div. 29; *Canet* v. *Smith*, 173 App. Div. 241; *Royal Bank of Canada* v. *Williams*, 220 App. Div. 603; *O'Reilly* v. *Gerry*, 249 App. Div. 850; *Hedeman* v. *Fairbanks, Morse & Co.*, 286 N. Y. 240.) Assuming that appellant did establish an enforceable contract, the evidence fails to sustain ratification of the alleged contract by respondent Fauntleroy. (*Hamlin* v. *Sears*, 82 N. Y. 327; *Redfield* v. *Norwalk & Co.*, 190 N. Y. Supp. 651; *Pickel* v. *Conn*, 209 App. Div. 410; *Stanton* v. *Granger*, 125 App. Div. 174.) The motion to dismiss for failure to prove a cause of action was properly granted upon the grounds specified in the trial court's opinion. (*Martin* v. *Home Bank*, 160 N. Y. 190; *People ex rel. Warschauer* v. *Dalton*, 159 N. Y. 235; *Haines* v. *N. Y. C. & H. R. R. R. Co.*, 145 N. Y. 235; *Meltzer* v. *Flying Fame, Inc.*, 224 App. Div. 41; *Troy Auto Exchange* v. *Home Ins. Co.*, 221 N. Y. 58; *Pagnillo* v. *Mack Paving & Construction Co.*, 142 App. Div. 491; *Bonny* v. *City of New York*, 156 App. Div. 287; *O'Brien* v. *Lehigh Valley R. R. Co.*, 176 Misc. Rep. 404.)

*John E. Mack* for James I. Bush, respondent. The alleged contract was void for vagueness, indefiniteness and uncertainty. (*Garcin* v. *Granville Iron Corp.*, 137 Misc. Rep. 648; *Royal Bank of Canada* v. *Williams*, 220 App. Div. 603; *Lally* v. *Cronen*, 247 N. Y. 58; *Strong* v. *Sheffield*, 144 N. Y. 392; *Smith* v. *Dotterweich*, 132 App. Div. 489.) The alleged contract is unenforceable because of the failure of the plaintiff to perform. (*Pershall* v. *Elliott*, 249 N. Y. 183; *Sternberg* v. *Curie*, 242 App. Div. 581; *Meriden Gravure Co.* v. *Bedell*, 232 App. Div. 454.)

DESMOND, J.  The substance of plaintiff's claim is this: He says he was employed or commissioned by persons other than defendants, to reorganize the corporation which owned a certain race track in New Hampshire, that he was working on this project when defendants, wishing to buy the race track, induced plaintiff to discontinue his efforts, on defendants' promise to pay him what he would have earned had he successfully worked out his original project of reorganizing the race track corporation through public financing. All the defendants admitted that they did buy the race track, but denied the making of any such contract with plaintiff; two of them, defendants Page and Fauntleroy, urged, besides, that if such an agreement was made with plaintiff, it was not binding on them. Motions to dismiss were made at the close of plaintiff's case and at the end of the whole case; the motion was granted as to defendant Norton, only.  The court, charging the jury, submitted really only this question of fact: as to whether defendants did make (or ratify) the promise testified to by plaintiff.  The jury's verdict was for plaintiff in the amount sued for, $55,000.  (Plaintiff in his complaint had demanded also fifteen per cent of the stock of the track corporation, but it had been stipulated that only the money claim would go to the jury, the other part of the claim to abide the verdict).  During the jury's deliberations it returned to the court room and asked the trial justice whether it could " bring in a verdict for a lesser amount than $55,000, such as 8 per cent of the $411,000, or $32,880." ($411,000 was the price actually paid by defendants for the race track).  The trial justice answered this: " No." Plaintiff's counsel took an exception, defendants' counsel did not.

The motions to dismiss, above referred to, as well as a motion to set aside the verdict, were all reserved by the trial justice (except that he did dismiss during the trial as to defendant Norton).  Later the motions were granted with an opinion.  In his opinion the trial court held that the verdict could not stand, for three reasons: (1) that there was a variance between the contract as pleaded and as proven, (2) that plaintiff failed to prove performance, and (3) that the contract is too vague, indefinite and uncertain to be enforceable. The court thereupon made an order setting aside the verdict and dismissing the complaint.  Appellate Division, First Department, unanimously affirmed, without opinion, and this court granted leave to appeal.

In the complaint plaintiff alleges that, up to 1935, the race track, owned by New Hampshire Breeders Association, Inc. was a profitable enterprise, with gross annual income for several years of over $1,000,000, and annual net income of over $275,000; that in 1935, said Association engaged plaintiff "as financial broker" to procure and assist in the refinancing, reorganization or recapitalization of the race track enterprise, and to procure underwriters or bankers to underwrite a first mortgage bond issue or other securities of a new corporation to be formed to own and operate the track, all with a view of making a public offering of such securities, that plaintiff assisted in devising plans for such purposes and procured to be entered into, an underwriting agreement between the Association and A. W. Porter, Inc. as underwriter, which underwriting agreement, according to the complaint, provided that the underwriter would take, at a discount, $750,000 mortgage bonds of a new corporation to be organized to take over the race track, that out of the net proceeds of $675,000, approximately $600,000 was to go to the old stockholders, plus sixty per cent of the stock of the new corporation. The eighth paragraph of the complaint alleges: "Eighth: That in consideration of and as compensation for the services rendered by the plaintiff in obtaining an underwriter and procuring the agreement as more fully set forth in paragraphs 'Sixth' and 'Seventh' above, the plaintiff was to receive, out of the said sum of $675,000, the sum of $55,000 in cash and fifteen (15%) percent of the common stock of said new corporation." The complaint goes on to allege that plaintiff induced and caused the old race track corporation and the underwriter Porter to agree that defendant Bush should be chairman of the new corporation's board and executive vice-president, that defendant Bush agreed to serve as such and to assist in the underwriting and sale of bonds so that plaintiff would receive his cash and stock as agreed; that, later, defendants decided that it would be to their advantage to buy the old corporation's stock privately and to organize a new corporation to be owned privately by them, all at a cash expenditure of less than the $675,000 involved in the Porter public financing project. The complaint alleges further that defendants requested plaintiff to discontinue his efforts to refinance the race track publicly for the old corporation, and that the defendants agreed with plaintiff that, in consideration of his abandoning those efforts and in

consideration of plaintiff's introducing defendants to the officers and directors of the old corporation " defendants would pay to plaintiff the sum of $55,000 in cash and would deliver to plaintiff fifteen (15%) percent of the common stock of a new corporation to be formed by them " to own and operate the track, provided that defendants acquired the track for an expenditure of $500,000, or less; relying upon this promise, plaintiff pleads, he brought his public financing activities to an end and introduced defendants to the old corporation's managers, that defendants, or their corporation, did buy the track for less than $500,000, in 1936, but refused to pay plaintiff $55,000, or to deliver to him fifteen per cent of the new stock, as promised; a second cause of action pleads a conspiracy to deprive plaintiff of these earnings, etc.

We must examine into the proofs, to see " whether in any view of it the case was for the jury" (*Hoose* v. *Drumm*, 281 N. Y. 54, 57). The background of this whole story is that plaintiff claims there was a forty per cent stock interest in the old corporation, which it was thought advisable to eliminate. The other sixty per cent was represented in all negotiations by attorney Joseph Shalleck, officer, director, stockholder, attorney for the corporation and attorney for one Smith, track manager and stockholder. Plaintiff says that the Shalleck-Smith group wished to get rid of the forty per cent interest and get persons of " stability and fine character " like defendant Bush, the reputation of the new people to be such as to assure a renewal of the race track franchise.

Plaintiff testified that he had been for years a " financial broker and consultant," that he was consulted by attorney Shalleck in connection with the proposed public financing, and that he then went actively to work on the matter. Mr. Shalleck testified that, after this, an oral agreement, suggested and worked out to some extent by plaintiff, was made with underwriter Porter, by the terms of which the underwriter would buy a new issue of mortgage bonds, at a price of $675,000 which would be sufficient to pay off the minority stockholders, provide working capital for a new corporation and pay $55,000 cash to plaintiff Geiger and his " group." Besides this, under the Porter plan, there was to have been available for distribution, according to Mr. Shalleck, the stock in the reorganized corporation, some of which would have gone to the underwriters, sixty per cent of which would have been delivered to the Shalleck

group and fifteen per cent of which would have gone to " Geiger [plaintiff] and Bush or whoever Geiger's associates were." Plaintiff testified that after the Porter plan had been broached, he [plaintiff] approached defendant Bush, who was of high repute in sport promotion circles, and who evinced interest in the project, and that there was thereafter a meeting attended by Messrs. Bush and Shalleck and by plaintiff, at which it was agreed that Mr. Bush would interest himself in the reorganization and that, if the proposed bond issue could be sold on the (Porter) terms above described, eight per cent of the net cash proceeds, or about $54,000, would be plaintiff's commission. Plaintiff says he then worked out in detail the underwriting agreement with Mr. Porter, which agreement, for reasons not to be charged against plaintiff, failed of performance. Plaintiff testified that this setback did not terminate his engagement or his efforts, that he looked for another " distributor " for the bonds, in the course of which search a banker suggested that " private financing " might be the better way to achieve the hoped-for reorganization. Thereupon, says plaintiff, he carried this thought to defendants Bush and McKoy, who agreed, or acquiesced in an oral agreement, that if plaintiff would " desist and not show this property to anybody or discuss it with anybody, and if we can buy this property ourselves for $500,000 or less, we will give him [plaintiff] the same compensation that he was to get under the Porter deal." This is the proof relied upon by plaintiff to charge defendants Bush and McKoy with liability for payment of the commission, in cash and stock. Plaintiff says that, agreeably to that oral understanding, he then discontinued his efforts to arrange a public offering of a new issue of bonds.

As to defendants Page and Fauntleroy, the testimony of plaintiff is that they were present later at a meeting where plaintiff, urging his own " big stake in the deal," inquired as to the progress of the proposed private financing, and gave the meeting the name of an attorney, who represented clients said to be interested in becoming part purchasers of the race track. Later still, according to plaintiff, he was notified that no help was needed from these newly suggested persons, because defendants had actually bought the race track for $411,000.

We hold that there was thus direct proof of an agreement by defendants Bush and McKoy to pay plaintiff the commission he

would have gotten on the Porter deal, and, also, proof sufficient for a jury's holding that defendants Page and Fauntleroy, after that agreement had been made, agreed to it, as joint adventurers with defendants Bush and McKoy. There was testimony, referred to above, that Messrs. Page and Fauntleroy, before defendants' purchase of the race track, had been put on notice, by plaintiff, of his claims, and had not attempted to dispute those claims, or to repudiate the authority of defendants McKoy and Bush, to incur such a liability, on behalf of the "group." The trial justice referred to the jury the question of whether defendants Page and Fauntleroy had authorized defendants Bush and McKoy to agree on behalf of the two former, as to plaintiff's commission, or whether the two former ratified the agreement. Possibly the question was not strictly one of authority or ratification, save as such a question is always closely bound up with the question of joint adventure (see *Jones* v. *Gould*, 209 N. Y. 419, 426, 427). But this part of the court's charge was not questioned by anyone, and proof was in the record on which could be based a finding that defendants Page and Fauntleroy had become bound to plaintiff, by acquiescence. It was a question of fact, also, on this record, whether or not plaintiff, by bringing in the outside attorney and his clients as possible part purchasers, had, as defendants claim, breached his agreement to desist from further efforts to find new investors or underwriters.

As to indefiniteness and uncertainty, we do not think there was such indefiniteness as to forbid a recovery (see *Hedeman* v. *Fairbanks, Morse & Co.*, 286 N. Y. 240, 251). As to plaintiff's failure to prove performance of so much of this alleged agreement as required him to introduce defendants to the officers of the old corporation: There is evidence that the old corporation's representative did not meet defendant Bush through plaintiff, and that they met the other defendants through defendant Bush. However, the jury could find from plaintiff's testimony that plaintiff brought defendant Bush to Mr. Shalleck in connection with the race track, even though Messrs. Shalleck and Bush might have known each other before. The other defendants were brought into the picture and to the notice of the old corporation, if plaintiff is truthful, by plaintiff, through defendant Bush and others. Surely the jury could find that by these activities plaintiff did everything necessary

and proper to " introduce " defendants to Mr. Shalleck " as prospective purchasers," as alleged in the complaint. It appears, too, that the promise to introduce the purchasers was not the important part of plaintiff's undertaking.

This analysis of the proof, especially plaintiff's proof, shows that the whole matter was a question of fact (except as to defendant Norton) with the proof much stronger against defendants McKoy and Bush than against defendants Fauntleroy and Page, but legally sufficient as to all of them. To some extent, the two contracts have been confused, in the proceedings below. Plaintiff is suing defendants, not on the contract which he claims to have had with the old corporation through Mr. Shalleck; he is suing on the contract which he says he made with defendants Bush and McKoy and which, according to him, was ratified or assumed by defendants Page and Fauntleroy as joint adventurers. It may well be that there is some little variance between, on the one hand, plaintiff's testimony of what Mr. Shalleck promised him, that is, eight per cent of $675,000, plus fifteen per cent of the stock, and, on the other hand, his allegations and proof as to what defendants promised him, that is, $55,000 and fifteen per cent of the stock. But as to the contract sued upon — the contract with defendants — there is no substantial variance between the allegations and the proofs. Even if the proof here shows that plaintiff at one time was talking about $55,000 and at another time was talking about eight per cent of $675,000, which would be $54,000, there is enough from which the jury could say that the promise of defendants was to pay $55,000 and that the reference to eight per cent was not controlling, but was roughly explanatory of the way in which the $55,000 figure was arrived at.

It follows that the trial court properly submitted the case to the jury, as against all the defendants except defendant Norton, and that the jury's verdict against the defendants, except defendant Norton, should not have been set aside.

The judgments should be reversed, and a new trial granted, with costs to abide the event.

LEHMAN, Ch. J., LOUGHRAN, FINCH, RIPPEY, LEWIS and CONWAY, JJ., concur.

Judgments reversed, etc.